## HENRY A. BREHM *v.* LEONARD RICHARDS ET AL.

*License to Use Bridge—Revocation—Aider by Injunction—Compensation for Improvements.*

Cesser of the use of an easement, coupled with an act clearly indicative of an intention to abandon it, will have the same effect as an express release of it.            p. 131

A right of way over land is an interest in the land which cannot, apart from prescriptive user and necessity, be created except in the mode and manner prescribed by the recording statutes.            p. 132

A license for a use of land and structures of a landowner is revocable, both at law and equity, whether the license is or is not executed by the expenditure of money by the licensee.

pp. 132-135

A landowner, revoking a license for the use of a bridge thereon, was entitled to the aid of a court of equity to make the revocation effectual.            p. 135

The fact that the answer to a bill for an injunction does not assert any right to compensation in case the injunction is granted does not preclude the allowance of compensation, such allowance being merely a limitation or qualification upon the aid to be given plaintiff.                                              p. 135

Where, after one had constructed a road upon the faith of a license given him to use a bridge with which it connected, the license was revoked, *held* that an injunction should issue to make the revocation effectual only on condition that the owner of the bridge pay to the licensee a reasonable compensation for the construction work on those portions of the road which he would cease to use on the issue of the injunction, and which were beneficial to the licensor in his use of the bridge, and that the licensee should be allowed a reasonable time in which to construct another crossing to use in place of the bridge.        pp. 135-137

*Decided January 21st, 1927.*

Appeal from the Circuit Court for Harford County, In Equity (HARLAN, J.).

Bill by Henry A. Brehm against Leonard Richards and others. From a decree for defendants, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, and PARKE, JJ.

*Vernon Cook* and *Thomas J. S. Waxter,* for the appellant.

*Stevenson A. Williams* and *Thomas H. Robinson,* with whom was *Fred R. Williams* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

The parties, Brehm and Richards, are the present owners of neighboring farms situated on the shores of Chesapeake Bay in Harford County, Brehm's, the northernmost farm, extending west and northwest to the bed of the Pennsyl-

vania Railroad, and the farms of Richards and a third
owner, Davis, lying to the south in a roughly triangular
section of land between the bay and Swan Creek, which
extends in from the bay in a northwesterly direction. Rich-
ard's farm is the southernmost of the three, extending to
the mouth of Swan Creek. The houses and farm buildings
of all three farms are situated near the bay shore. Oaking-
ton Station, on the railroad, is adjacent to the northwestern
line of Brehm's farm, and for sixty years or more a common
private road has run from the station southerly, mostly
through woodland, to connect with the separate roads run-
ning east to the buildings of the several farms. A small
stream running south to Swan Creek was, from time imme-
morial, crossed by a ford, at a place on Brehm's farm, in
the woods, where the banks were low and the water shallow,
and on the easterly side of the ford a separate road for the
Brehm farm turned off to the north and then to the east,
while the common road for the other two farms continued
on to the south. About ten years ago, that is, about 1916,
Brehm, in order to avoid inconveniences connected with ford-
ing the stream, built himself a concrete bridge or culvert
on the higher land, 156 feet further north on his place, and
opened roadways, with a gravel and oil surface, to join the
common road on the west and his separate farm road on
the east. The new bridge had then no connection with the
common road on the east of the stream, but persons using
that road began to use the bridge and drive over the land
from it to the road, until Brehm built a fence of 75 or 100
feet in length to the south, across the course thus being cut
over his land. The fence remained for about two years,
until Richards bought his farm and began to improve the
entire common road with a macadamized surface. Seeing
this work being done, Brehm removed the fence when the
new surface approached the bridge, and permitted the im-
proved road to be carried across his bridge, and to make
connections across his lands with the old bed of the common
road. And thus it has remained ever since, or for about

eight years.  There was no communication between Brehm
and Richards at the time of the improvement of the road,
and the utilization of the bridge; the parties had not become
acquainted with each other then.  Asked at the trial why
he made use of this concrete culvert instead of building one
over the stream where the old road was, Richards testified
that "the bridge was there and it seemed foolish to build
another, and I used the one that was there."  And Pusey,
who did the work on the road, testified that Mr. Michael,
then owner of the farm now owned by Davis, directed him
to go off the old road, and that the higher land was the
logical place to build the road.

In the winter of 1923 to 1924, timber and lumber going
to and from the Davis farm were hauled over the bridge,
and Brehm, intending to restrict this hauling to the old
crossing at the ford, which remained open, entered into a
discussion with Richards about the rights to the use of the
bridge, and the discussion developed a difference of view.
Brehm contended that the carrying of the road with the
new surface over the bridge was done only by virtue of a
courtesy or privilege extended to Richards personally, and
not by virtue of any property right; and Richards replied
that it had been represented to him by the owner of the
Davis farm at the time, that Brehm would permit the use
of the bridge in consideration of Richards' macadamizing
the road to the benefit of all the owners, including Brehm.
As the discussion did not result in settling the difference,
Brehm rebuilt his fence cutting off the connecting road
between the bridge and the common road to the south,
Richards and his employees, the remaining defendants in
the case, removed it, and Brehm filed a bill for an injunc-
tion to restrain interference with his permanent closing of
the road thus fenced off.  The trial court found that no
agreement between Brehm and Richards or any one else,
upon consideration, for use of the bridge, had been proved,
and that no title to the new crossing had been acquired by

Richards, but that as the plaintiff had seen the work being done, and acquiesced in it as a change of location of the common way in order to secure a better crossing at the creek, the plaintiff should not be given the injunction prayed.

With the finding of fact this court agrees. In reply to Brehm's denial of any agreement on his part with the other landowners, or of any act other than his own voluntary one of removing his fence and permitting his bridge to be used, the defendants introduced evidence of conferences at the time between Brehm and the former owner of the Davis farm, now dead, but that these conferences concerned the use of the bridge for the common road was not testified to. There ·was, therefore, no proof of an actual agreement for making use of the bridge. And there was no suggestion made in the testimony, or in letters exchanged between the parties, that the resurfacing of that part of the common road, to the north, which Brehm used, was dependent upon his consenting to the utilization of his bridge for the ·other landowners' crossing at the stream. The evidence shows only an informal, voluntary utilization of the bridge by Richards, and an acquiescence in it by Brehm. The case is one, therefore, of a parol license to use property, followed by construction of the road connections, and eight years' common use. And the questions are: whether the owner of the bridge can legally, under the circumstances of the case, revoke a license so given; if he can, whether a court of equity will aid him in making his revocation effectual; and if it will, whether this shall be upon condition of restoration or compensation by him for the expense incurred in reliance upon the permission to cross the bridge.

There is much confusion in the law generally concerning such questions. Courts have felt impelled to render what has seemed to be justice in situations resulting from use of land by informal permission or license, notwithstanding the sweeping requirements of the conveyancing statutes, without ignoring those requirements, and without, on the other hand, attaching unjust consequences to mere permissive uses, and

subjecting titles to some of the very uncertainties which the Statute of Frauds and the recording statutes are intended to prevent. But there is great lack of harmony in the principles and theories resorted to. 3 *Kent, Commentaries,* 453; 27 *Yale Law Jour.* 66. We think, however, that a review of the decisions of this court discloses a line of reasoning consistently held, and which must control the decision in this case.

In the case of *Wright v. Freeman,* 5 H. & J. 467, an action on the case for obstructing an old way, it appeared that a new way had been opened over the same land, and used for many years, and that, meanwhile, the landowner had built fences and other structures over the old way. The landowner prayed an instruction to the jury that, if it were found that the parties had agreed in parol that the landowner should have exclusive use of the bed of the old way in exchange for the use of the new way by the owner's house, then no action could be maintained by a user of the way unless a legal revocation of the agreed change was proved, and that, further, the user of the way could not of himself revoke it. But the trial court instructed the jury that either party could revoke it by parol; and this court, page 478, said: "By the common law, a private right of way must be created by prescription (which presupposes a grant) or by grant, or it must arise by operation of law, and in such case is generally termed a way of necessity; and in all these cases it can only be extinguished by a release, or by the union of the land and the right to the easement, in the same person. So a private way, created by the Act of 1785, can only be extinguished in the same way. An agreement, therefore, by parol, in the case now under review, could pass no legal right on either side. It did not operate to extinguish the old right of way, or to create a new one; it simply amounted to a license on either side, and as such it might be revoked by either party." The statement here as to the requirement for extinguishment of an easement is narrower than the full general rule: cesser of use, coupled with an act clearly indicative of an

intention to abandon the easement, would have the same effect as an express release of it. *Vogler v. Geiss,* 51 Md. 407, 410; *Stewart v. May,* 119 Md. 10. But the rule that the license to use the new way is a revocable one seems to be still the law in this state.

It is well settled that a right of way over land is an interest in the land which cannot (apart from prescriptive user and necessity) be created except in the mode and manner prescribed by the recording statutes. *Hays v. Richardson,* 1 G. & J. 366; *Baltimore and Hanover R. Co. v. Algire,* 63 Md. 319, 320. "A permanent interest in land cannot be acquired by a mere license, and a right of way being an interest in land, it is equally well settled that such an interest cannot be acquired at law in this state, except in the mode provided by the statute, that is, by deed executed and recorded." *Baltimore and Hanover R. Co. v. Algire, supra,* page 323. And a mere license is from its nature revocable at the will of the licensor, at least when the license is for the use of the licensor's land. In *Addison v. Hack,* 2 Gill, 221, 226, this Court followed the distinction, widely adopted elsewhere, between a license to use the licensor's land and a license to make some use of the licensee's own land which affects the licensor; if the licensee has acted upon the license to make the use of his own land, that license is held not revocable, but a license to use the land of the licensor is always revocable at law, because irrevocability would mean a conveyance of a permanent interest in the land in violation of the statutes. In this state, what has been termed execution of the license, that is to say, the expenditure of any labor or expense in reliance upon it, does not give a permanent, irrevocable right in the use of the land. In the case already cited, *Baltimore and Hanover R. Co. v. Algire,* the appellant had constructed its railroad over a strip of the appellee's land, in reliance upon a license from the landowner, but this was held no defense to an action of trespass brought against it after revocation of the license. "Cases may be found, it is true," said the Court, page 321, "in which the

defense now relied on has been held to be a good defense, even in actions at law. Some of these cases proceed on the ground that where one has induced another, either by express consent or acquiescence, to incur expense in the erection of permanent works, he will not be permitted to deprive the licensee of the benefits of such expenditure by reason of want of complete legal title. In other words, such conduct on the part of the licensor operates as an estoppel *in pais*. Other cases proceed on the principle exercised by courts of equity in the specific performance of parol contracts in regard to the sale of land, and give to a license thus executed the force and effect of a contract." And after considering these decisions, this Court (Robinson, J.) stated its own conclusion, already quoted, that an irrevocable license could not be acquired in Maryland except in the mode provided by statute.

The Court, in the *Algire* case, left undecided the question "whether a court of equity would restrain the application of this rule in a case where one by express consent or acquiescence has induced another person to incur expense in the construction of permanent works, and afterwards attempts to deprive such person of the benefits of his expenditure by reason of the want of a complete legal title." The railroad company later brought a suit in equity for an injunction, on the ground of an estoppel against the revocation of the license, but the court found no agreement for a permanent license proved, or other ground of estoppel, and added (*Baltimore and Hanover R. Co. v. Algire,* 65 Md. 337, 340): "Under our statute, that an interest in land shall pass only by deed duly executed and recorded, the policy of this State is not to favor any substitute as a means of acquiring title, and equity would intervene only to prevent fraud or the infliction of loss resulting from the bad faith of the licensor." In *Shipley v. Fink,* 102 Md. 219, the case was that the occupant of one of two adjoining properties in Westminster, proposing to build a butcher shop between the house on that property and the dividing line, and to widen it in the rear by extending it over the adjoining property in the rear of the

house there, changed his plan at the request or suggestion of
the adjoining owner, and utilized the space to the side of the
adjoining owner's house, and built on both sides of the divid-
ing line, and so avoided darkening the rear windows of the
adjoining house. The shop was built accordingly, and re-
mained across the line of both properties for four years or
more, when a subsequent owner of the adjoining lot ordered
the structure removed, and as it was not removed undertook
himself to tear it down. The owner of the structure brought
his bill in equity for specific performance of an alleged
agreement to convey him the strip of adjoining property
covered by the building, and for an injunction against the
tearing down of the building. The court failed to find an
enforceable agreement to convey the strip, and concluded that
there was nothing more than a parol license for the enjoy-
ment of an easement in the land and the wall of the house
against which the structure was built; and such a license the
court found to be revocable, so that the removal of the struc-
ture could not be prevented by a court of equity. In the
opinion, by Judge Pearce, cases from other jurisdictions
were quoted, and from that of *Houston v. Laffee,* 46 N. H.
507, a case much cited in this branch of the law, this extract
was quoted and in part italicized, "It has been held that
where a license like the one in this case has been given to
plaintiff to enter upon defendant's land and do acts which
involved expenditure of money, and the license becomes exe-
cuted by an expenditure incurred, it is irrevocable on the
ground that a revocation under such circumstances would be
fraudulent or unconscionable. But we think the later deci-
sions sustain the doctrine that the license is in all cases revoc-
able, so far as it remains unexecuted, *or so far as any future
enjoyment of the easement is concerned;* for to hold other-
wise would be giving to a parol license the force of a con-
veyance of a permanent easement in the real estate, and no
such right or interest in real estate can be created by parol."
And in another case in equity, *Dawson v. Western Maryland
R. Co.,* 107 Md. 70, it was held that an easement for a basin

beside a canal owned by the railroad company's predecessor in title, not having been secured by deed acknowledged and recorded according to the statutes, was held by a revocable license only. And this principle, the court said, page 93, had been announced in equity as well as at law, citing the cases of suits to prevent revocation of rights in cemetery lots, *Partridge v. First Independent Church,* 39 Md. 631, and *Rayner v. Nugent,* 60 Md. 519, and the case of *Shipley v. Fink,* just reviewed.

The rule adopted in this state, then, both at law and in equity, is that a license for a use of land and structures of a landowner is revocable, whether that license is or is not executed by the expenditure of money by the licensee. The principle of equitable estoppel cannot be resorted to for prevention of revocation. It therefore follows that the landowner in this instance could legally revoke the license given to the appellees to make use of his bridge and his land connecting with it; and relegate them to the old way. And he was consequently entitled to the aid of a court of equity to make the revocation of the license effectual. *Duvall v. Ridout,* 124 Md. 193; *Gilbert v. Arnold,* 30 Md. 29. And see collection of cases in note on "Injunction as a proper remedy by licensor where license to use real property has been revoked," 38 A. L. R. 1138.

There remains to be considered a question, raised in argument, whether the court of equity, having jurisdiction of the matter, should lend its aid to making the revocation of license effectual, only upon condition that some compensation be paid by the appellant to the appellee Richards for the expense of the road connections built by him upon the faith of the license to use the bridge, and which will be lost to him upon reverting to the use of the old crossing. The appellant objects that a right to compensation is not asserted in the answer, but the allowance of compensation with an injunction seems not to be dependent upon pleading; it is a limitation or qualification upon the aid to be given the plaintiff. There is another objection, that the cost of the

bridge connections is not shown, and that even if it were shown it is not new roadbed that is to be lost; but such facts can be ascertained by further proceedings in the court below if the case is one for allowance of compensation. That in some cases, at least, and especially where money has been expended and work done in the proper expectation of permanent use, courts of equity will require compensation as a condition to revocation of the license, is well settled. "In such cases," said the Court in *Carter v. Harlan,* 6 Md. 20, 28, "equity interferes, and exacts that the party making the improvement shall be indemnified." And in *Shipley v. Fink, supra,* page 228, it was stated that if the licensor himself had still owned the land, he would not be allowed to withdraw his consent and prevent the future use of the building erected for the enjoyment of the easement, without making compensation to the licensee, and the court would retain the bill to enable it to ascertain and decree a just compensation; but the licensor having parted with the land the court, instead, ordered the bill retained and the injunction continued for ten days to enable the licensee himself to remove his building without unnecessary injury. And see *Dawson v. Western Maryland R. Co., supra,* page 94. And it seems to us that the present case comes within that rule. When the appellant removed his first fence to let the newly surfaced roadway through by his bridge, he in effect invited the appellees to proceed that way, or certainly consented to it, and their proceeding with the road so constructed would seem to have been naturally upon the assumption of a use practically permanent.

Our conclusion is that the appellant is entitled to the injunction prayed, and that the court below should retain the bill and ascertain and award the appellee, Richards, a reasonable compensation for the construction work on those portions of the road which he will cease to use upon the issuance of the injunction and which are beneficial to Brehm in his use of the bridge and way, and that, furthermore, he should be given a reasonable time to construct such im-

proved, modern, crossing as may seem proper at the site of the old ford, with the necessary improvement of the surface connections, and that the injunction against the use of the new crossing, as prayed, shall be issued subject to the payment of compensation and the allowance of time for reconstruction as stated.

> *Decree reversed, and cause remanded for further proceedings in accordance with this opinion, with costs to the appellant.*